TS:TAF
F#2006R00508

**M06-0327**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA

        v.

MONYA ELSON and
LEONID ROYTMAN,

        Defendants.

------------------------------X

TO BE FILED UNDER SEAL

APPLICATION FOR
ARREST WARRANTS

(18 U.S.C. § 1958)

EASTERN DISTRICT OF New York, SS.:

        GREGORY SHEEHY, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation, duly appointed according to law and acting as such.

        Upon information and belief, there is probable cause to believe that in or about and between December 2004 and the present, within the Eastern District of New York and elsewhere, the defendants MONYA ELSON and LEONID ROYTMAN, did commit an offense against the United States, to wit, a murder for hire conspiracy, in that the defendants, together with others, did knowingly and intentionally conspire to travel and to cause others to travel in interstate and foreign commerce and to use and cause others to use a facility in interstate commerce, to wit: a telephone, with intent that a murder be committed in violation of Sections 105.00 and 125.25 of the New York Penal

1

Law, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, in violation of Title 18, United States Code, Section 1958. The bases for my belief are set forth below.[1]

(Title 18, United States Code, Section 1958).

## BACKGROUND

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 9 years. Since 1998, I have been assigned to FBI Squad C-24, which is a joint FBI/NYPD task force responsible for the investigation and prosecution of Russian Organized Crime[2] in the New York metropolitan area. In this capacity, I have participated in numerous investigations and conducted and participated in physical and electronic surveillance, reviewed numerous electronically intercepted conversations and executed search warrants. I have also interviewed and debriefed numerous confidential sources and cooperating witnesses.

2. In the course of these investigations, I have become familiar with the history of Russian Organized Crime and

---

[1] Because the purpose of this affidavit is solely to establish probable cause in support of the requested arrest warrants, I have not set forth all of the information I have developed in the course of this investigation.

[2] As used herein, "Russian Organized Crime" denotes criminal organizations consisting of individuals born and/or raised in the former Soviet Union.

2

the various Russian criminal organizations operating in the New York Metropolitan area.

3.  On the basis of my experience, I know that MONYA ELSON is one of the most notorious and feared members of the Russian criminal underworld.  ELSON's reputation is based in part on his extensive criminal record which includes a conviction for racketeering in the Southern District of New York.  The charges against ELSON were based on his leadership of a criminal enterprise known as "Monya's Brigade" and participation in three murders, two attempted murders and extortion.  ELSON is currently on supervised release as a result of the racketeering conviction.  ELSON was also convicted of narcotics trafficking in Israel in 1982.

4.  On the basis of my experience and reliable confidential source information, I also know the defendant LEONID ROYTMAN to be a well known member of the Russian criminal underworld with long-standing ties to the Solntsevskaya Brigade, one of the largest and most powerful criminal organizations in the former Soviet Union.

## THE INSTANT INVESTIGATION

5.  I am currently investigating a murder-for-hire plot orchestrated by the defendants MONYA ELSON and LEONID ROYTMAN.  Throughout this investigation, I and other members of C-24 have worked closely with representatives of Ukrainian law

enforcement agencies including Interpol Ukraine and the Main Directorate for Combatting Organized Crime of the Ministry of Internal Affairs of Ukraine. Together with the assistance of Russian speaking translators and law enforcement officials, I have reviewed documentary evidence, audio recordings and video recordings collected by Ukrainian law enforcement as part of this investigation.

6. The information provided by Ukrainian law enforcement has consistently proven reliable and is in all respects consistent with information developed by the FBI. Set forth below is a summary of the sum and substance of the information developed by this investigation. This summary includes information personally known to me, as well as information provided to me by other law enforcement officials, including Ukrainian law enforcement officials, working on the investigation.

### INFORMATION PROVIDED BY CS-1

7. Throughout this investigation, a Confidential Source ("CS-1") has provided information to Ukrainian law enforcement. The information provided by CS-1 has proven reliable and has been corroborated by independent evidence, including numerous consensual tape recordings.

8. As part of this investigation, I have also, together with the assistance of Russian speaking law enforcement

agents, reviewed both a written statement by CS-1 and a videotaped statement by CS-1 each of which summarizes CS-1's knowledge of, and participation in, the subject murder conspiracy. Both statements were prepared under the supervision of Ukrainian law enforcement as part of the instant investigation. In accordance with standard Ukrainian procedure, CS-1 was warned prior to giving both statements about the criminal penalties in Ukraine for making false statements in connection with a criminal investigation.

9. CS-1 has informed Ukrainian law enforcement, and repeated in the videotaped statement, that he is prepared to testify in a U.S. court in connection with the prosecution of this case. Set forth below is a summary of the sum and substance of the information provided by CS-1.

10. In early 2005, CS-1 was contacted in Kiev, Ukraine by MONYA ELSON. CS-1 had first met ELSON in Budapest in or about 1991-1992 when CS-1 served as one of the heads of security for Semyon Mogilevich, a well-known Russian businessman and organized crime figure currently under indictment for fraud and money laundering in the Eastern District of Pennsylvania. Mogilevich introduced CS-1 to ELSON and assigned CS-1 to provide security for ELSON on two occasions in Budapest. CS-1 knew ELSON to be a powerful Russian Organized Crime figure.

11. Upon contacting CS-1 in 2005, ELSON explained to

CS-1 that he was currently living in New York and could not travel because of his supervised release. ELSON stated that he had a proposition for CS-1, which he could not discuss over the telephone. ELSON further stated that his associate "Leonid" (subsequently identified as the defendant LEONID ROYTMAN) would be coming to Kiev and asked CS-1 to meet with ROYTMAN. ELSON also stated that CS-1 would make good money if he agreed to work with ELSON and ROYTMAN on this issue.

12. Approximately two weeks later, CS-1 was contacted by someone who identified himself as "Lyonya" (a short form of the name "Leonid.") ROYTMAN explained to CS-1 that he had come to Kiev on ELSON's behalf and asked CS-1 to meet him in an apartment in Kiev. CS-1 asked his associate, the person identified herein as CS-2, to accompany him to the meeting with him. CS-2 agreed.

13. At this meeting, in substance, ROYTMAN explained that he had come to Kiev on ELSON's behalf to commission the murder of Slava and Alex Konstantinovsky, twin brothers commonly known in the Russian criminal underworld as the "Brothers Karamazov" (hereinafter "the brothers"). ROYTMAN stated he had served for several years as head of security for the brothers and therefore knew that they controlled several very valuable businesses, including a major Ukrainian bank. ROYTMAN further stated that he and ELSON had developed a plan to kill the

brothers and take control of their businesses and asked CS-1 to arrange the murder of the brothers.

14.  CS-1 told ROYTMAN that, in order to kill the brothers, he would require $50,000 "up front," $50,000 after the murder, and a percentage of the brothers' businesses. ROYTMAN stated that the brothers' businesses were worth approximately $25,000,000 and promised that, if the plan succeeded, CS-1 would receive a 5% share of these businesses.[3]

15.   Several days later, CS-1 scheduled another meeting with ROYTMAN, but decided to send CS-2 to meet with ROYTMAN alone.  Prior to this meeting, CS-1 told CS-2 to record the meeting with ROYTMAN so that they would have the recording in case ROYTMAN and ELSON tried to threaten, blackmail or kill them. CS-2 agreed to go to the meeting and to record it.[4]

16.   According to CS-1, CS-2 told CS-1 that during the

---

[3] Based on my training and experience and reliable confidential source information, I know that ELSON has been the subject of several murder attempts and that the Konstantinovsky brothers have been suspected by members of the Russian criminal underworld of organizing one of these murder attempts.  Based on my training and experience, I believe that the brothers' suspected organization of the murder attempt may have provided ELSON with an additional motive to have them killed.  When he was interviewed by a C-24 agent shortly after the most recent attempt on his life in 1993, ELSON stated that he would take revenge, "but not in the United States."

[4] Unbeknownst to CS-2, CS-1 videotaped ROYTMAN and CS-2 meeting on the street.  I have watched this videotape and recognized ROYTMAN, whom I have surveilled in New York, as one of the participants.

meeting, ROYTMAN showed CS-2 where the brothers lived, worked, exercised and spent their leisure time and made suggestions as to how and where to kill them.  This meeting was consensually recorded by CS-2.  I, together with Russian speaking law enforcement agents assigned to this investigation, have reviewed pertinent portions of the recording of this meeting and found its contents to be consistent in all material respects with the account provided by CS-1.

       17.  In February, 2005, ROYTMAN, CS-1 and CS-2 met again in Kiev to discuss the murder plan in more detail.  During this meeting, as related by CS-1, and as confirmed by a consensual recording made by CS-1, ROYTMAN showed CS-1 and CS-2 locations frequented by the brothers and discussed with CS-1 and CS-2 various ways in which the brothers could be killed.  Specifically, ROYTMAN, CS-1 and CS-2 discussed, among other options, shooting the brothers from a distance with a high-powered rifle, followed by an additional shot in the head at close range.  They also discussed what kinds of guns would be best to use for the job.  ROYTMAN and CS-1 also discussed the possibility of blowing the brothers up with a car bomb and/or a bomb hidden in their homes and ROYTMAN offered to provide any explosives needed to do the job.

       18.  In approximately late February 2005, ELSON called CS-1 and told CS-1 that his associate "Yura" would be coming to

Kiev to meet with CS-1 and would bring him "a size 50" (a reference, according to CS-1 and Ukrainian law enforcement, to $50,000). CS-1 decided to send CS-2 to the meeting alone and told him to tape record the meeting. CS-2 agreed. According to CS-1, CS-2 told him that at this meeting "Yura" paid CS-2 $50,000 as an advance for expenses in preparing the murder.

19. Over the next several months, CS-1 and CS-2 spent the $50,000 on personal expenses and failed to carry out the murder of the brothers. By the summer of 2005, ELSON started calling CS-1 frequently, demanding to know why the job had not yet been completed. CS-1 put ELSON off and told ELSON that killing both brothers at the same time would be too difficult. At some point during the summer of 2005, CS-2 told CS-1 that he was uncomfortable with this situation and was afraid of what ELSON might do to them because they had not done the job. As a result, CS-1 and CS-2 cut off all contact and have not spoken since.[5]

### INFORMATION PROVIDED BY CS-2

20. Throughout this investigation, a Confidential

---

[5]/After their falling out, CS-1 retained possession of all the tapes that CS-1 and CS-2 had made in connection with the murder plot. All tape recordings described herein have been turned over by CS-1 and have been reviewed by Russian speaking law enforcement agents. Based on information provided to me by these Russian speaking law enforcement agents, I believe that their contents are in all material respects consistent with the accounts of the subject meetings which have been provided by CS-1 and CS-2.

Source ("CS-2") has provided information to Ukrainian law enforcement. The information provided by CS-2 has proven reliable and has been corroborated by independent evidence, including numerous consensual tape recordings.

21. As part of this investigation, I have also, together with the assistance of Russian speaking law enforcement agents, reviewed both a written statement by CS-2 and a videotaped statement by CS-2 each of which summarizes CS-2's knowledge of, and participation in, the subject murder conspiracy. Both statements were prepared under the supervision of Ukrainian law enforcement as part of the instant investigation. In accordance with standard Ukrainian practice, CS-2 was warned prior to giving both statements about the criminal penalties in Ukraine for making false statements in connection with a criminal investigation.

22. CS-2 has informed Ukrainian law enforcement, and repeated in the videotaped statement, that he is prepared to testify in a U.S. court in connection with the prosecution of this case. Set forth below is a summary of the sum and substance of the information provided by CS-2.

23. From in or about and between 2000 and 2005, CS-2 worked as a driver for CS-1. In late 2004, CS-1 informed CS-2 that he was conducting negotiations with "Monya from America" (a reference to ELSON). CS-1 told CS-2 that ELSON said that he had

a business proposition for CS-1 and asked CS-1 to meet with his representative "Leonid" (a reference to ROYTMAN) in Kiev to discuss this proposition.

24. In early 2005, CS-2, together with CS-1 met with ROYTMAN in an apartment in Kiev. During this meeting, ROYTMAN stated that it would be necessary to "physically liquidate" the "Brothers Karamazov." ROYTMAN further stated that the brothers are the owners of a "serious business" and conduct their business in an unethical manner and cheat people.

25. After this meeting, CS-2 told CS-1 that he did not want to participate in the plot to kill the brothers. In response, CS-1 stated that he wanted to see how things develop and suggested recording their meetings with ROYTMAN.

26. Over the next several weeks, CS-1 and CS-2 met more than once with ROYTMAN in Kiev. During these meetings, ROYTMAN showed them the brothers' house and apartment, identified restaurants where they spend time and provided the license plate numbers of their cars. ROYTMAN also explained that he was familiar with the brothers' security guards and suggested how CS-1 and CS-2 might get around these guards. During one of these meetings, ROYTMAN asked how much money would be required to do the job and CS-1 stated that they would need $50,000 up front to purchase weapons, cars and other equipment and another $50,000 after the job. ROYTMAN agreed to these terms and also stated

11

that, after the murder, he and ELSON would take the brothers' business and give CS-1 a 5% share. ROYTMAN further stated that if CS-1 and CS-2 did not do the job, then he and ELSON would give the contract to some "thugs" from Transdniester[6], who were ready to do the job.

27. In February 2005, at CS-1's direction, CS-2 met with an individual who identified himself only as "Yuri" in a cafe in Kiev. At this meeting, "Yuri" handed CS-2 a bag containing $50,000, which, Yuri explained, was from "Leonid." After this meeting, CS-2 gave the $50,000 to CS-1, who promised to give CS-2 his share of the money. During the spring and summer of 2005, CS-1 gave CS-2 approximately $5,000 in portions, which CS-2 used for personal expenses.

28. During the summer of 2005, CS-2 began to fear that ELSON might kill them for taking his money and not carrying out the contract and suggested to CS-1 that they seek protection from, and turn over the tapes they had made, to Ukrainian law enforcement. However, CS-1 told CS-2 to mind his own business and said that he would take care of the situation. CS-1 also told CS-2 that if CS-2 told law enforcement about the situation, CS-1 would not give CS-2 his 30% share of a joint business

---

[6] Based on my training and experience, I know that Transdniester is a disputed region located between Moldova and Ukraine that, according to Ukrainian law enforcement officials, is home to numerous organized criminal gangs and hit men who are hired by Ukrainian criminals.

venture that they were pursuing. Fearing for his safety, CS-2 decided to break relations with CS-1 and to cooperate with Ukrainian law enforcement.

## CS-1'S PROACTIVE COOPERATION

29. Throughout the fall of 2005, after the falling out with CS-2, CS-1 continued to maintain contact with ELSON. In several conversations, CS-1 assured ELSON that the job would be done, but said that killing both brothers at the same time would be too difficult. Therefore, in late 2005, ELSON told CS-1 that he should first kill the brother whose name begins with "S" (a reference to Slava Konstantinovsky) who, according to ELSON, was the more powerful of the two, and then kill the other brother. ELSON further agreed to pay CS-1 $50,000 for each murder, rather than $50,000 for both murders, as previously agreed.

30. In late 2005, CS-1 told ELSON that he had developed a specific plan to kill Slava by luring him away from his bodyguards with a prostitute. However, by March 2006, CS-1 had still not carried out the murder. In or about March 2006, fearing that he might be arrested for his participation in the murder conspiracy and/or murdered by ELSON and ROYTMAN for failing to carry out the murder after having taken their $50,000, CS-1 decided to cooperate with Ukrainian law enforcement.

31. At the direction of Ukrainian law enforcement, CS-1 then engaged in several consensually recorded telephone

calls with ELSON. Almost all of these calls were made to or from a "718" hard line telephone number in Brooklyn, New York registered to ELSON's wife. Russian speaking law enforcement officials assigned to this investigation have listened to these recordings. In addition, I have reviewed English language transcripts of several of these calls prepared by FBI translators. The following is a summary of the sum and substance of these conversations based on information provided to me and my review of the English language transcripts.

32. In consensually recorded telephone conversations on or about March 10, 2006, CS-1 told ELSON in substance that everything regarding the murder plan, including the prostitute, was "super" and ready to go. CS-1 further stated, in substance, that the main thing would be to avoid to "screwing up" by killing the wrong brother first. In response, ELSON said "God forbid" and confirmed that the "one with the letter 'S'" should be taken care of first. ELSON also said, in substance, that he was frustrated because the job had not yet been done and stated that he had agreed in September, October and January to put it off and insisted that it be done by the 15th because he had given "guarantees."

33. CS-1 then stated that he needed to start preparing "the second one," (a reference, according to CS-1 and Ukrainian law enforcement, to the planned murder of Alex) and asked ELSON

14

how much time he would have to do "the second one." ELSON then stated that it was too early to discuss the second one and said that he did not want to discuss the second one until the first one had been resolved and reiterated that the job had to be done by the 15th of March.

      34. Fearing that ELSON and ROYTMAN would kill CS-1 for failing to carry out the contract and then hire another hitman to kill the brothers, Ukrainian law enforcement directed CS-1 to tell ELSON that he had killed Slava. Accordingly, on March 14, 2006, CS-1 called ELSON and told him that he had just "finished with . . . the guy. So you don't have anything to worry about, the first matter has been solved." CS-1 further stated that "it's closed . . . "Dvukhkolosny" (a reference, according to CS-1 and Ukrainian law enforcement, to Slava[7]) is gone forever." ELSON said "good" and asked if it was "100% taken care of." CS-1 responded "of course."

      35. In a call later in the day on March 14, 2006, ELSON asked CS-1 why nobody had "heard anything" (a reference, according to CS-1 and Ukrainian law enforcement, to the fact that there had been no discussion of Slava's disappearance). In response, CS-1 explained that he had done everything according to plan so that "not a single trace" had been left. ELSON then

---

[7] In Russian, "Dvukhkolosny" means the "guy with two tires," a reference, according to CS-1 and Ukrainian law enforcement, to the fact that Slava likes to ride a motorcycle.

asked "beside you, how many people know ?" CS-1 responded that he would take care of everything so that "there will not be a single person left - on my side - who knows anything" (a reference, according to CS-1 and Ukrainian law enforcement, to CS-1's proposal to kill the people he had hired to do the job.) ELSON responded "I got you." ELSON also stated that he would call CS-1 on the following day.

36. In calls on or about March 15, 2006, ELSON told CS-1 that he was convinced that the job had been done[8] and said that he would pay CS-1 within three weeks. CS-1 stated that he needed the money so that he could resolve "the second matter" (a reference to the plan to kill Alex). ELSON assured CS-1 that he would pay him and said "I swear to you that everything will be all right."

37. In a call on or about March 19, 2006, ELSON asked CS-1 to provide him with the name and number of someone who could collect the money on CS-1's behalf. ELSON said that he could have the money delivered either in Kiev or New York. On March 20, 2006, at the direction of Ukrainian law enforcement and C-24, CS-1 provided ELSON with a phone number of someone he identified

---

[8] In order to prevent ELSON from killing CS-1 and/or hiring other hitmen to kill the brothers, Ukrainian law enforcement took measures to create the appearance that Slava had been killed, including, for example, relocating him and causing Alex to file a missing person's report. It appears that these measures convinced ELSON that Slava had been murdered.

as "Gena" (in reality, an NYPD undercover officer (hereinafter "UC")) who, CS-1 said, would collect the money for him in New York.

38.  On March 21, 2006, UC received a call from someone who identified himself as "Misha" and said that he had a "package" for UC.  In a series of calls on March 21, 2006, UC and "Misha" agreed to meet at Caesar's Bay shopping center in Brooklyn on March 22, 2006.  During these calls, Misha gave UC a cell phone number where he could be reached if necessary.  The number provided by "Misha" was identical to a cell phone number which ELSON had previously provided to CS-1 as a number where ELSON could be reached.  On March 21, 2006, ELSON called CS-1 in Kiev and told CS-1 that he had arranged a meeting with CS-1's person in New York for delivery of the money.  All of the March 21, 2006 calls described in this paragraph were consensually recorded.

39.  On March 22, 2006 at approximately 1:00 p.m., ELSON met with UC at Caesar's Bay and handed UC a bag containing $30,000.  ELSON asked UC to let his people know that he had received the money.  ELSON also stated that he would provide the remaining $20,000 to UC within two weeks.  This meeting was consensually recorded by UC and videotaped by FBI and NYPD surveillance agents.  After this meeting, ELSON and CS-1 spoke by telephone and confirmed that the money had been delivered.

Wherefore, I respectfully request that arrest warrants be issued for the defendants MONYA ELSON and LEONID ROYTMAN so that they may be dealt with according to law.

Because of the nature and contents of this application, I respectfully request that this application and the accompanying arrest warrants be filed and maintained under seal until execution.

_____
GREGORY SHEEHY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION